20898

W. Paul DeBORDE, Maynard Austin, A. M. Suggs, Curtis Gillespie, Carol Collins, John E. Strawn, Alice J. Smith and Ben Stern, a/k/a Bridgewood and Neighboring Area Association and Trenholm Investment Corporation, Petitioners, of which W. Paul DeBorde, Maynard Austin, A. M. Suggs, Curtis Gillespie, Carol Collins, John E. Strawn, Alice J. Smith and Ben Stern, a/k/a Bridgewood and Neighboring Area Association, are Appellants, v. ST. MICHAEL AND ALL ANGELS EPISCOPAL CHURCH, Respondent.

(252 S. E. (2d) 876)

*W. Rhett Eleazer,* and *James D. Cooper, Jr.,* of *Ratchford & Cooper,* Columbia, *for appellants.*

*Harold W. Jacobs,* of *Nexsen, Pruet, Jacobs & Pollard,* Columbia, *for respondent.*

February 27, 1979.

*Per Curiam:*

The order of the lower court sets forth and correctly disposes of all issues submitted to this Court on appeal. Let that order, with modifications, be printed as the directive of this Court.

## "ORDER

"This matter came before the Court, by agreement of counsel, by way of petitioners' declaratory judgment action seeking a determination as to whether the creation of a churchyard cemetery upon the premises of respondent was in violation of certain restrictive covenants imposed upon its property, and alternatively, whether the cemetery's creation and operation thereon would constitute a private nuisance.

"Respondent is an active Parish within the Diocese of Upper South Carolina of the Protestant Episcopal Church of the United States of America and has title to a 6.2 acre tract of land situated in a U-shaped intersection between North Trenholm Road and Bridgewood Road, in the area northeast of the City of Columbia, South Carolina. The property is bounded on the west by North Trenholm Road, which runs in a north-south direction, and on the north and east by Bridgewood Road, which exists on an easterly course from Trenholm and proceeds through a gentle curve to the right to a predominantly southerly direction along respondent's property's northern and eastern boundaries. It is generally bounded on the south by lots bordering on Shorebrook Road. The two exceptions are a lot immediately to the south on North Trenholm Road and a lot immediately to the southeast bordering on Bridgewood Road.

"At the southeastern corner of respondent's property, Bridgewood Road commences a gentle turn to the left and continues for approximately 180° until it essentially parallels the portion fronting on respondent's property. Lots front along the full periphery of Bridgewood Road.

"At the trial, W. Paul DeBorde, Curtis Gillespie, John E. Strawn and Alice J. Smith were the only individual petitioners to testify. None are parishioners of respondent. All own homes fronting on Bridgewood Road. Petitioner Gillespie resides on the same side of Bridgewood Road on which respondent's property is located at the point where Bridgewood Road runs approximately west to east before turning back in a northerly direction. His western property line is almost 200 feet east of respondent's southeastern boundary, with two lots intervening. He can see a portion of respondent's property from a portion of his. The remaining individual petitioners who testified reside on the northerly stretch of Bridgewood Road, after the completion of its left turn, and are completely screened from view of respondent's property by the loop created by Bridgewood Road's 180

degree reversal of course. By Bridgewood Road the nearest portions of their respective properties to that of respondent are approximately: Smith—500 feet; Strawn—750 feet; and DeBorde—950 feet.

"Forest Lake Development Company, the common grantor in the chains of title of the individual petitioners and respondent, executed a 'Declaration', dated February 27, 1956, and properly recorded in the Office of the Clerk of Court for Richland County, which allegedly imposed certain covenants, conditions and restrictions on specified lots within specific blocks designated in paragraph 12 thereof. These restrictions basically limited the development of those designated lots to single-family dwellings and empowered the owners of any of the lots listed therein to enforce these covenants and restrictions.

"Thereafter, on January 30, 1958, Forest Lake Development Company conveyed a portion of the property in issue to respondent and granted it options on the remainder of its 6.2 acre tract. All of the property conveyed and optioned to respondent was listed in paragraph 12 of Forest Lake Development Company's 1956 Declaration as incorporating Lots 14 through 27 in Block 73 of a certain duly recorded plat. The deed conveying this property from Forest Lake Development Company to respondent, which was a printed form, containing virtually the identical restrictions as set forth in the Declaration of 1956, modified these restrictions by typed insertion authorizing respondent to construct church buildings on the property and otherwise use it for church purposes.

"Thereafter, on September 17, 1958, Forest Lake Development Company, along with two individuals, executed and had properly recorded in the Office of the Clerk of Court for Richland County, a Declaration and Agreement for the benefit of respondent. This Declaration and Agreement recited that the grantors were the owners of all lots in Blocks 73 and 74 listed in paragraph 12 of Forest Lake Development

Company's Declaration of 1956, other than those owned by respondent, and that the grantors had no objection to respondent using both the property previously conveyed and that optioned to it for 'church and/or recreation purposes'.

"Subsequently, Forest Lake Development Company transferred all of its unsold property, including that portion under option to respondent, to another company and forfeited its charter. Thereafter, by way of merger, Calhoun Life Insurance Company acquired title to this property and subsequently, conveyed it to respondent by a series of transactions in the mid-1960's.

"Calhoun Life Insurance Company thereafter conveyed all of its unsold property to petitioner Trenholm Investment Company, which has since disposed of all of its assets in the general Trenholm Road-Bridgewood Road area, with the exception of two lakes, and has filed Statement of Intention to Dissolve with the Secretary of State of South Carolina. It now owns none of the lots described in paragraph 12 of Forest Lake Development Company's Declaration of 1956.

"Title to the individual petitioners' properties, all of which are situated in either Blocks 73 or 74 as identified by Forest Lake Development Company's 1956 Declaration, was derived from one or more of the parties executing that document subsequent to the execution and recordation of Declaration and Agreement in 1958.

"In the intervening years, respondent, through construction of church buildings, a youth hut and playground and landscaping, had developed roughly the northern half of its property. The southern portion remains undeveloped pine forest in essentially the same condition as when acquired by it. As another step in its long range plan to utilize its property and extend its ministry, in January of 1977, respondent's Vestry, its governing body, created a committee to investigate the feasibility of establishing a cemetery within the undeveloped area. A landscape architect was retained as a consultant for the project. Upon receipt of his report,

including a colored rendering of his recommendations, the committee contacted all owners of property on Trenholm and Bridgewood Roads facing its lands, as well as those with lots bordering its southern boundary and advised them of its feasibility study. These neighbors were also invited to attend a meeting to discuss this development and to examine the preliminary rendering. This meeting attracted, not only respondent's immediate neighbors, but property owners throughout the general area.

"The initial rendering proposed a vehicular access off of Bridgewood Road through the undeveloped area of respondent's property to the cemetery site, with an exit onto Trenholm Road. Some of the immediate neighbors voiced objection to traffic congestion which might be created by the Bridgewood access and its opening to their view of grave preparation and burial services. To meet this concern, the committee instructed the landscape architect to relocate the cemetery site and the access to it.

"As a result, the proposed cemetery site was relocated within its undeveloped property nearer to Trenholm Road. As redesigned and relocated, it encompassed a rectangular area 265' by 120', with its longer side offset 30 feet from and parallel to, the Trenholm Road right-of-way and its northern border abutting respondent's developed property.

"When fully developed the cemetery will accommodate 530 burial sites. Respondent intends to encourage multiple family usage of these sites by incorporating a layered burial system whereby a single grave site is designed to include interment of husband and wife and infant children. Consequently, it is anticipated that the cemetery will accommodate a thousand or more individual burials.

"Respondent will not convey fee interest in the burial plots but will grant interment rights. Only its communicants in good standing will have the privilege of acquiring these rights and their usage will be limited to the communicants and relatives related by blood, marriage or adoption. Members of

the general public or communicants of other Episcopal churches in the area will not be entitled to acquire interment rights.

"Respondent's congregation is composed of approximately two hundred family units. Since its inception in 1958, funerals of thirty-eight of its parishioners have been conducted on its premises. In view of the limited size of respondent's congregation, the limitations placed on those eligible to acquire interment rights and the statistics of an average of less than two funerals per year for a twenty year period, it is anticipated that the proposed cemetery will meet the needs of the Parish for a century or more. Respondent, because of these factors, intends to develop the cemetery site in phases. The first phase will incorporate the northwest quadrant, the second phase the northeast quadrant, the third phase the southeast quadrant and the fourth phase the southwest quadrant of the rectangular site.

"The cemetery is designed as a natural woodland garden setting, with serpentine walks and flush-type monument tombstones. There will be no vehicular access to the cemetery, other than for maintenance equipment, which will be from Trenholm Road. Visitors' access will be from the parking lot on the east side of the property along a pathway around the north side, and around the west side, of the church buildings. Processionals for burials will be by walkway from the Sanctuary to its intersection with the path to the west of the building.

"The development of these plans evidences an admirable sensitivity and concern of the parishioners of respondent for the feelings of its neighbors. In general, processionals will be completely screened from view from Bridgewood Road by the church buildings. The cemetery site itself at its closest point will be 250 to 300 feet from Bridgewood Road and will be screened by the natural forested conditions of the undeveloped property and selected plantings. View of the cemetery site from its Trenholm Road neighbors will be screened

by a steep decline and plantings. The site's southern exposure, when fully developed in the distant future, will be buffered by ninety feet of woodlands and plantings. Its northern boundary abuts respondent's developed property and will generally be screened from view by terrain and plantings.

"Subsequent to the redesign of the cemetery to accommodate the complaints of its immediate neighbors, respondent advised interested parties of its intention to proceed with the cemetery project. Thereafter, its Vestry sought, and secured, permission from the Bishop of the Diocese of Upper South Carolina, and its Standing Committee, to establish a cemetery upon its property. Its Vestry thereafter on December 15, 1977, dedicated, and reserved, the proposed area for cemetery purposes, created the St. Michael and All Angels Parish Cemetery Committee and adopted a Constitution and Bylaws by which the Committee will administer the cemetery. On Christmas Day, 1977, a service was conducted by its Rector officially consecrating the site for burial purposes.

"This litigation was subsequently commenced by petitioners seeking a declaration that the construction of the proposed cemetery by respondent would constitute both a violation of the restrictive covenants imposed upon it by the Declaration of Forest Lake Development Company of 1956, as amended by its Declaration and agreement of 1958, and a private nuisance. Respondent answered and moved for summary judgment as to petitioner Trenholm Investment Company and to strike all references to Bridgewood and Neighboring Area Association from the complaint. It also moved to sever the causes of actions of the several petitioners but consented to the consolidation of their independent actions for trial. These motions were taken under advisement and the parties proceeded with the trial of this case before this Court without a jury. At the conclusion of the testimony, respondent moved for summary dismissal of the causes of action of the individual petitioners, Maynard Austin, A. M. Suggs, Carol Collins and Ben Stern, who did not testify.

"The view that the Court takes of the facts, and the controlling law, of this case makes resolution of respondent's motions unnecessary. The two controlling issues raised by the pleadings and the evidence are: (1) Does the creation of a church yard cemetery by respondent on its property violate the restrictive covenants imposed by the Declaration of 1956, as amended by the Declaration and Agreement of 1958? (2) Will the creation of a churchyard cemetery by respondent constitute a private nuisance as to any of the petitioners?

"Clearly, the creation of a churchyard cemetery by respondent is the utilization of its land for a church purpose which was expressly authorized by the individual petitioners' predecessors in title, and the corporate petitioner's alleged predecessor in interest, through their execution of the Declaration and Agreement of September 17, 1958. From *The New Testament* times churches have maintained churchyard cemeteries as an outreach of their mission. The burial and care of the dead is an integral part of the worship of the Almighty God. The burial and consecration of gravesites and cemeteries are sacraments of the Episcopal Church. *Webster's New Twentieth Century Unabridged Dictionary,* Second Edition, defines a churchyard as 'the ground adjoining a church, often used as a cemetery'.

"The creation and maintenance of cemeteries by churches as a legitimate extension of their ministry is further recognized by a statute and constitution in many states. A concern arose in this country in the Nineteenth Century about the accumulation of lands for business purposes by religious bodies. During this period, many states placed limitations on churches, either by constitution or statute, as to the amount of land that they could own and the purposes for which such land could be used. *Evangelical Lutheran Synod v. Hoehn,* 355 Mo. 257, 196 S. W. (2d) 134 (1946). Without exception these states recognized that the three major legitimate concerns of a church were the holding of land for purposes of erecting a place of public worship, a parsonage and a

cemetery. *Sales v. Southern Trust Company,* 182 Tenn. 270, 185 S. W. (2d) 623 (1945); *Spradlin v. Wiman,* 272 Ky. 724, 114 S. W. (2d) 111 (1938); *Miller v. Ahrens,* 150 F. 644 (W. Va. 1907); *Regents of University of Maryland v. Trustees of Calvary ME Church South in the City of Baltimore,* 104 Md. 635, 65 A. 398 (1906); *Hamsher v. Hamsher,* 132 Ill. 273, 23 N. E. 1123 (1890); *Norfolk Presbytery v. Bollinger,* 214 Va. 500, 201 S. E. (2d) 752 (1974).

"The utilization of a portion of its premises for cemetery purposes by St. Michael and All Angels Episcopal Church, therefore, is both a historically and theologically supported extension of its mission for the worship of Almighty God and is a legitimate church purpose for which it is expressly authorized to engage by the Declaration and Agreement of September 17, 1958.

"Petitioners' contention that this Declaration and Agreement, limits rather than expands the purposes for which respondent may make use of its property is without foundation. After an acknowledgement of the general restrictions on the property created by the Declaration of 1956, the pertinent portions of the document read as follows:

'Whereas, St. Michael & All Angels Episcopal Church is erecting a building to be used for church purposes on lots 17, 18, 19, 22, 23 and 24 in Block 73, and is making plans, for itself or its assigns, to develop and use lots 14, 15, 16, 20, 21, 25, 26 and 27 in Block 73 for church and/or recreational purposes, all of which will be of benefit to the neighborhood:

Now, therefore, know all men by these presents, that Forest Lake Development Company, Clyde R. Burns and Harold E. Gibson, being all of the owners of the lots in Block 74 and all of the lots 13 through 47 in Block 73 other than those sold or optioned to St. Michael & All Angels Episcopal Church, in consideration for the payment to us of the sum of $1.00, the receipt of which is hereby acknowledged, do hereby state that we have no objection to the use or proposed use of Lots 14-27 in Block 73 for church and/or recreational purposes.'

"Petitioners contend that the phrase at the end of the ▮ Whereas Clause ('all of which will be for the benefit of the neighborhood') limits the use by respondent of its property to activities from which each individual neighbor will personally benefit. They further argue that since they, not being parishioners of respondent, will not be entitled to interment within the cemetery, its creation will be of no benefit to them and, therefore, will violate the terms of the Declaration and Agreement."

We disagree.

"Clearly, the grantors inserted the disputed language solely for the purpose of indicating their belief that the development of a church on the property with its accompanying activities, would be an asset to the general neighborhood. They did not do so to place a limitation on respondent's use of its property for legitimate church purposes. This construction is reinforced by the absence of similar language from the final paragraph of the document. There, in unequivocal terms, the grantors place no limitations, and state no objection, to the use of the premises by respondent for church purposes.

"During the trial petitioners also raised the issue that ▮▮ the actions of respondent in creating a cemetery were *ultra vires*. The purpose for its establishment is recited in its Charter as the '(s)support of the public worship of Almighty God according to the doctrine, discipline and worship of the Protestant Episcopal Church in the United States of America and in the Diocese of Upper South Carolina'. Petitioners contend that this grant is not broad enough to permit respondent's operation of a cemetery for the benefit of its parishioners. The simple answers to this contention are twofold: (1) this issue was not raised by the complaint; and, (2) even had it been, petitioners, not being members of the Parish, have no standing to raise it. *South Carolina Code of Laws* (1976), Section 33-3-30. Additionally, as discussed *supra.,* the operation of a church cemetery clearly is encompassed within the purpose as set forth above.

"This brings the Court to the key issue in this case, does the creation by respondent of a private church cemetery on its premises constitute a private nuisance as to one or more of the petitioners? This area of the law is explored in depth by *Young v. Brown*, 212 S. C. 156, 46 S. E. (2d) 673 (1948), which went up on an appeal from the overruling of a demurrer to the complaint on the grounds that it failed to state a cause of action. The pertinent allegations were that the plaintiffs were adjoining homeowners to a fifty acre tract of land on the outskirts of Florence, South Carolina which defendant intended to develop into a commercial cemetery; the cemetery was in full view of the homes; there would be virtually daily burials in the cemetery, with the accompanying funeral processions; the graves of the dead would be constantly visited by the bereaved, all of which would cast a pall of gloom over their properties and adversely affect their enjoyment of it, thereby creating a private nuisance as to them.

"The Court sustained the lower court's ruling on the demurrer and sent the case back for trial. In doing so, it recognized both the split of authority as to whether a cemetery can constitute a private nuisance unless it is operated in such a fashion as to offend the physical senses and the absence of controlling authority in this State. The Court, therefore, for the guidance of the court below on the trial of this case, expounded in great detail the principles applicable to this area.

"It noted that the operation of a cemetery might under certain circumstances constitute such a burden on neighboring property as to be an unreasonable infringement upon the enjoyment of the lands by its owners and thereby become a private nuisance. To establish the line beyond which one's exercise of his property rights becomes a legal infringement upon the property rights of another requires the delicate balancing of the correlative rights of the parties; the right of one generally to make such lawful use of his property as he

may desire and the right of the other to be protected in the reasonable enjoyment of his property.

'Resort must always be had to sound common sense and due regard should be given to the notions of comfort and convenience entertained by persons generally of *ordinary tastes and susceptibilities*. A lawful business should not be enjoined on account of every trifling or imaginary annoyance, such as may offend the taste or disturb the nerves of a fastidious or over-sensitive person, but on the other hand no one, whatever his circumstances or condition may be, should be compelled to leave his home or live in mental discomfort, although caused by a lawful and useful business carried on in his vicinity. Emotions caused by the constant reminder of death may be just as acute in their painfulness as suffering perceived through the senses.

'Applying the foregoing principles to the question before us, we think that maintenance of a cemetery may under certain circumstances, constitute a private nuisance even though not detrimental to the health or offensive to the physical senses of those living nearby. *It may be readily conceded that the mere fact that a body is buried near a residence is not reasonably calculated to cause a depressed feeling or affect the cheer and happiness of the home and we may assume, without deciding, that the constant view of markers or tombstones over the graves would probably not produce a depressing effect upon the mind of the average person, but these are not the only incidents connected with a cemetery. There is the passage of the funeral procession with its mourners and the last rites at the grave followed by frequent visits of the bereaved persons, all of which are conducive to depression and sorrow and when constantly recurring in close proximity to a residence may deprive the home of the comfort and repose to which the owner is entitled. Proper respect for the dead and those in grief and sorrow naturally imposes a restraint at such times on the usual laughter and play of children and*

*social and family gatherings could not be held under cheerful surroundings.* (Emphasis added) 46 S. E. (2d) 679.

\* \* \* \* \*

'Cases may arise in a residential area where those complaining are so far removed that they could not reasonably be said to be affected.' Consideration must also be given to the relative size of the cemetery and the frequency of burials therein. One who lives close to a small cemetery in a rural community where there is only an occasional burial would not be affected as to the same extent as one living adjacent to the entrance to a cemetery serving a large metropolitan area where funerals are almost daily occurrences. Regardless of how much one may be affected by the location of a cemetery near his home, a cemetery is as pointed out in some of the cases, a necessity. It must be located adjoining the property of someone and be reasonably accessible to the community which it serves. The area around a large city may be so thickly populated that the only location available is in a more or less residential section. Under these circumstances, private convenience must yield to the convenience of the public. 46 S. E. (2d) 680.'

"Applying the facts of this case to these principles, it is apparent that the creation and operation of respondent's proposed cemetery is an appropriate and proper utilization of its premises which will not constitute a private nuisance as to any of the petitioners. None who testified are immediate neighbors of respondent. Of those petitioners who did testify, none could see the cemetery location from their property and only one, Curtis Gillespie, could see any part of the church property from any portion of his land. As a matter of fact, because of the location of the cemetery within the large wooded undeveloped area of the remainder of respondent's 6.2 acre tract, it will not be visible from the lands of any of the surrounding property owners.

"The operation of the cemetery will not change the activities now occurring in the neighborhood in any fashion. Since

its formation twenty years ago, funerals of parishioners have been conducted on its premises. This occasions the arrival of the hearse and the mourners and the transportation of the coffin into the Sanctuary. Thereafter, at the conclusion of the service, the coffin is removed from the Sanctuary and placed in the hearse. The funeral procession then departs with all the attendant traffic problems, for the burial site, incidentally not by way of any of petitioners' property, but by exit onto Trenholm Road around respondent's northern boundary.

"With the construction of respondent's cemetery, so far as petitioners are concerned, the only apparent differences will be that there will be no organized procession from the Church. Everything will be identical up through the funeral service conducted within the Sanctuary. Thereafter, the body will be removed through a side door and a foot processional will be conducted to the cemetery site, which by virtue of screening by buildings and the location of the cemetery in the wooded screened area, will be virtually unobservable from Bridgewood Road and certainly totally unobservable from the property of petitioners.

"Likewise, individuals visiting gravesites at times other than a funeral will not be noticeable. The access to the cemetery will be around the northern side of the church building and, so far as petitioners are concerned, those going to visit the cemetery will be indistinguishable from those going to the Church for other purposes.

"Consequently, none of the factors enumerated in *Young v. Brown, supra,* as significant in determining whether a cemetery would constitute a nuisance in a neighborhood are present in this case. The creation of a cemetery will not cause any more or less funerals to be conducted at the Church and the visual activities attendant therewith will be unchanged from conditions existing prior to the construction of the cemetery. Nor will mourners visiting the cemetery be visible to petitioners. Furthermore, as contrasted with a fifty acre com-

mercial cemetery with daily funerals, respondent has had an average of less than two funerals per year conducted on its premises since its founding in 1958. Even, therefore, if the cemetery were visible to petitioners from their homes, its projected use is clearly such that it would not impose an unreasonable burden on their enjoyment of their respective properties.

"Petitioners concede this point. The fact that funerals were conducted at the Church did not worry them.

The fact that they could, or could not, see the cemetery and gravesites was of no consequence to them. The fact that they would, or would not, be able to see the actual burials was of no consequence to them. The annoyance to the individual petitioners is simply the knowledge of the existence of a cemetery in their general neighborhood. The mere annoyance arising from the physical presence of a cemetery in the general vicinity of one's home is not sufficient infringement upon the owner's right to the peaceful enjoyment of his property to constitute a private nuisance. *Young v. Brown, supra.*

"Although the Court is impressed with the sincerity and obvious concern of the petitioners, the use to which respondent intends to put its property does not rise to the level which would constitute a legal invasion necessary to create a private nuisance. To hold otherwise would be to hold that the creation of a cemetery by any church on its premises located anywhere in the vicinity of one or more residences, regardless of activity attendant therewith or visual impact upon adjoining property, would constitute a nuisance per se. Such is not the law of this State.

"It is therefore ordered, adjudged and decreed that the complaint of petitioners be dismissed with prejudice and judgment entered for respondent."