## 2538

Harry G. O'CAIN, James Harold O'Cain, Patricia Ann O. Whetsell and Sandra K. Reid, Respondents/Appellants v. Lever H. O'CAIN, Leroy A. O'Cain, Marion L. O'Cain, Lever H. O'Cain, Jr., and Glen H. O'Cain, Appellants/Respondents.

(473 S.E. (2d) 460)

Court of Appeals

*James B. Jackson, Jr.,* Orangeburg, *for appellants/respondents.*

*Ladson H. Beach, Jr.,* Orangeburg, *for respondents/appellants.*

Heard June 5, 1996.

Decided July 8, 1996.

HUFF, Judge:

Harry G. O'Cain (Jerry), James Harold O'Cain, Patricia Ann O. Whetsell, and Sandra K. Reid (the Harold O'Cain family) brought this action seeking an easement and an injunction

for a private nuisance against Lever H. O'Cain, Leroy A. O'-
Cain, Marion L. O'Cain, and Glen H. O'Cain (the Lever O'Cain
family). The master granted the Harold O'Cain family an
easement over a driveway, finding the Lever O'Cain family
was equitably estopped from denying the easement. He fur-
ther found the placement of hogs in front of Jerry O'Cains res-
idence did not constitute a nuisance. Both families appeal. We
affirm in part and reverse in part.

## FACTS

All of the parties to this action are the direct descendants of
the late Henry H. O'Cain. Henry H. O'Cain devised a tract of
land known as Forest Place to his son Harold O'Cain. He fur-
ther left an adjoining tract of land known as the Old Heirs
Place to another son, Lever H. O'Cain. The designated bound-
ary line between the two tracts was an old creek. A public
road was built between the two tracts and was later paved by
the Highway Department. While the road runs along the old
creek bed, it does not exactly follow the boundary line and, at
some points, crosses over the line so that the boundary line
runs on both sides of the public road. As a result, the lever
O'Cain family owns a small strip of land between the road and
land owned by the Harold O'Cain family. Specifically, this
small strip runs in front of the Harold O'Cain home, built over
50 years prior to the institution of this suit, and the home of
Jerry O'Cain, which was placed on the property around 1986.
There has existed for over forty years a driveway crossing
the small strip of land to the Harold O'Cain home. The master
ruled this driveway should remain open, as a prescriptive
easement had been established. This ruling is not challenged
on appeal.

Around 1986, Jerry O'Cain, with the permission of his fa-
ther, Harold O'Cain, placed a mobile home on the property
below his father's home, making significant improvements.
This included underpinning and bricking around the mobile
home and the addition of decks. He further had a driveway
built across the narrow strip of land leading to his home. This
driveway is referred to as the seven-year driveway. In addi-
tion to approximately $35,000 spent on the trailer, Jerry
O'Cain testified he spent between $20,000 and $25,000 in im-
provements. He further stated that he discussed the fact that

he needed a driveway with his father and he understood his father had obtained permission from Lever O'Cain to build the driveway over the strip. Lever O'Cain denied giving anyone permission. The master found, and the record shows, that at no time during the construction of the driveway did the Lever O'Cains object to it, although they were present and aware of the work being done on the driveway, as well as the other improvements to Jerry O'Cain's home.

Prior to his death in 1991, Harold O'Cain leased a portion of his land on the lower end, next to the canal, to members of the Lever O'Cain family, for the purpose of raising hogs. Subsequent to Harold O'Cain's death, the children had a master plat and individual plats prepared in order to divide the property. Jerry O'Cain testified a dispute between the Harold O'Cain family and the Lever O'Cain family arose after the property was surveyed for the purpose of dividing the Harold O'Cain property. Although he was unsure what caused the dispute, he related it to questions regarding the leasing of property for raising hogs and a proposal to Lever O'Cain that the Harold O'Cain family buy the small strip of land. In March 1994, the Lever O'Cain family erected a fence along the property line separating the small strip of land from the Harold O'Cain property, thereby blocking both driveways and cutting off access to the Harold O'Cain property. Subsequent to the filing of suit by the Harold O'Cain family, the Lever O'Cain family placed their hogs within the strip of land running directly in front of both the Harold O'Cain and Jerry O'Cain residences.

Jerry O'Cain asserted the hogs were placed in front of his property out of malice. He testified the Lever O'Cain family had further made his property unsightly by placing cans and five-gallon buckets on the posts of the fence they erected and the back of a toilet tank on the top of a trailer pole in front of his property. He stated the hogs, the cans and the toilet tank devalued his property, making it virtually impossible to sell, and that the hogs in front of his home created odor and attracted more flies than when the hogs were further down on the side of his house. He admitted that hogs had been raised in that area in the past, but stated they had ceased putting hogs in the knoll when he put his home on the property, and had possibly stopped putting the hogs there as early as around 1978 or 1979. He further stated he had no objection to

the hogs being in the canal area.

Marion O'Cain testified that prior to Jerry O'Cain moving on the property in 1987, the hogs were on the strip in front of the property all the way up to the forty-year driveway. He stated when the seven-year driveway was put in, the wires were cut and he couldn't let the hogs go up there because they would have then gotten loose. He further testified he had an arrangement with Harold O'Cain whereby he would give Harold one hog a year in exchange for the use of some of Harold's land to raise the hogs. Around 1989, he "quit" that arrangement because he was no longer able to use the strip since the Harold O'Cains were using it, so he "figured that would be even."[1] He stated he did not go back and put wire up along the strip in front of Jerry's house to allow the hogs up there because "that would be closing up the driveway."

After the plats were prepared and the property line established, Marion put up the fence and moved the hogs off of the Harold O'Cain property. Although no one ever definitely told Marion he had to move the hogs off the Harold O'Cain property, he believed from previous conversations that they were going to tell him to move the hogs. He stated, "I did not say a word, 'cause I knowed what to do about them, 'cause we had land to put them on, and that's what I did when we got the line surveyed." Once the line was established by the survey, Marion began putting up the fence, running the wire across the driveway, because he knew "they didn't have permission to put the driveway in." He then moved the hogs onto the strip of land.

Marion admitted he had other land on which to raise the hogs, but stated this area already had "feeders and concrete poured and wire there." When asked why he had to use the section of the strip in front of Jerry's house, he claimed it was "to keep the grass and the weeds down," and because that part was on a higher hill. He further stated the reason he put them in front of Jerry's house was "for them to have some exercise and walk." Finally, he stated, "You paying taxes on it and you got to use it for something."

---

[1] Apparently, Marion felt because Jerry had built the driveway, thereby precluding his use of the land for his hogs, he did not need to continue paying them for the use of their land.

The master found the Harold O'Cains did not obtain permission to build the seven-year driveway. However, he found the Lever O'Cains were equitably estopped from denying the Harold O'Cains use of the driveway. The master further found the hogging operations were ongoing on this property for years and the only change was that the Lever O'Cains let the hogs start roaming in front of Jerry O'Cain's house. He found that the smell and odor of the hogs and the flies they attracted were no worse now in that area than they were in the past and the hogs in the front of the house only adversely affected the aesthetics of the home. He therefore concluded the hogs in front of the house did not constitute a nuisance.

## *LEVER O'CAIN APPEAL*

On appeal, the Lever O'Cain family asserts the master erred in finding the seven-year driveway should remain open based on equitable estoppel. We disagree.

As stated in the case of *Frady v. Smith*, 247 S.C. 353, 147 S.E. (2d) 412 (1966), the elements of equitable estoppel are as follows:

The essential elements of an equitable estoppel as related to the party estopped are: (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are: (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially.

The Lever O'Cains argue there is no evidence of false representation or concealment of facts calculated to convey the impression that the facts are otherwise than those that they now assert. They argue they were silent as to the fact they had not given any permission to build the driveway because they were not sure of the actual boundary line. We disagree.

There is evidence of record that Lever O'Cain, as well as other members of the O'Cain family, were present during the actual construction of the seven-year driveway and were aware of the various improvements made to the residence to which the driveway led, yet they expressed no opposition to the building or the use of the driveway in question. Further, it is immaterial that the Lever O'Cains were unsure of the exact boundary line, because Marion O'Cain admitted he was still aware of the fact that the driveway crossed some property owned by his father. Despite this fact, no action was taken by any of the Lever O'Cain family until they perceived the Harold O'Cain family was going to require them to remove the hogs from the leased property.

The Lever O'Cain family next argues there is no evidence of their intention or expectation that their silence would be acted on by the Harold O'Cain family. They assert the Harold O'Cain family had already begun building the driveway before they had an opportunity to say anything in regard to the construction. This argument ignores the evidence that the Lever O'Cains implicity acquiesced in the building of the driveway when they remained silent during not only the construction of the driveway, but also as Jerry O'Cain made improvements of some $55,000 to the land to which the driveway led. Further, the record shows that Marion O'Cain only took action to deny the Harold O'Cain family access over the driveway after he thought they were going to require removal of the hogs from their land, and that he was completely aware of the fact that "they didn't have permission to put the driveway in." Finally, the Lever O'Cains concede they had actual knowledge of the real facts.

The Lever O'Cains next assert the elements of equitable estoppel are not met because the Harold O'Cain family knew the truth as to the facts in question. They argue the Harold O'Cains knew they were building the driveway over the Lever O'Cain property and knew they did not have written or direct permission from anyone in the Lever O'Cain family. However, the record shows the Harold O'Cains believed they did in fact have permission. We therefore find the Harold O'Cains did not know the truth as to the facts in question.[2]

---

[2] The Lever O'Cains do not argue the Harold O'Cains had the means of obtaining knowledge of the truth and there is no indication this specific issue

The Lever O'Cains further argue the Harold O'Cain family did not rely on the conduct of the Lever O'Cain family because the decision to build the driveway was made before the Lever O'Cain family was aware of it. Once again, this ignores the evidence that the Lever O'Cains sat back and remained silent during the construction of the driveway as well as the improvements to the land, even though they were aware of the work being done. Further, it was not until after some dispute arose between the two families that the Lever O'Cains took any action inconsistent with the Harold O'Cain family's use of the driveway. Finally, the Lever O'Cains argue there was no prejudicial change of position because the evidence shows Jerry O'Cain put a single-wide mobile home on the lot prior to the construction of the driveway and there exists another driveway a short distance up the road that he could use to gain access to the house. While the record shows Jerry O'Cain initially placed a single-wide mobile home on the property approximately three months prior to the building of the driveway, it further shows he replaced the single-wide with a double-wide approximately two years later and made considerable improvements to the double-wide. As to the argument that another driveway exists which could be used for access, the record is not clear as to the distance of this other access point or the feasibility of its use. In fact, the record indicates substantial problems with any other route. Specifically, a new road would have to be built from the Harold O'Cain residence to get to Jerry O'Cain's house. Although Jerry O'Cain testified he could also access his house by driving over his sister's property, he stated it was a low area which was a problem because it became wet and soggy. Further, his sister testified she would not be willing to grant a right of way across her property if it would encumber her property, making it too difficult to sell. We therefore find the record shows a prejudicial change of position. Accordingly, we find no error in the master's finding that the Lever O'Cain family is equitably estopped from denying the Harold O'Cain family use of the seven-year driveway.

---

was raised before or ruled upon by the master. Accordingly, we make no finding on this specific element.

## HAROLD O'CAIN APPEAL

The Harold O'Cain family appeals from the master's finding that the placing of hogs in front of Jerry O'Cain's residence did not constitute a nuisance. They argue the evidence presented at trial shows the Lever O'Cain family's actions in enclosing the hogs in front of the residence were intentional and malicious and such was not a reasonable use of the property. We agree.

An action for an injunction is equitable. *Blanks v. Rawson*, 296 S.C. 110, 370 S.E. (2d) 890 (Ct. App. 1988).

Since this is an action in equity tried by a single judge, this court has jurisdiction to find facts in accordance with our own view of the preponderance of the evidence. *Id.*

In resolving issues relating to a private nuisance, we must deal with the conflicting interests of landowners. *Winget v. Winn-Dixie Stores, Inc.*, 242 S.C. 152, 130 S.E. (2d) 363 (1963). To establish the line beyond which one's exercise of his property rights becomes a legal infringement upon the property rights of another requires the delicate balancing of the correlative rights of the parties; the right of one generally to make such lawful use of his property as he may desire and the right of the other to be protected in the reasonable enjoyment of his property. *DeBorde v. St. Michael and All Angels Episcopal Church*, 272 S.C. 490, 252 S.E. (2d) 876 (1979). In cases where an injunction is sought to abate an alleged private nuisance, the court must deal with the conflicting interests of the landowners by balancing the benefits of an injunction to the plaintiff against the inconvenience and damage to the defendant, and grant or deny an injunction as seems most consistent with justice and equity under the circumstances of the case. *LeFurgy v. Long Cove Club Owner's Association, Inc.*, 313 S.C. 555, 443 S.E. (2d) 577 (Ct. App. 1994).

An owner of property, even in the conduct of lawful business thereon, is subject to *reasonable limitations* and, in the operation of such business, *must not unreasonably interfere* with the health or comfort of neighbors or their right to the enjoyment of their property. *Winget*, supra. (Emphasis added.) If a lawful business is operated in an unlawful or unreasonable manner so as to produce material injury or great annoyance to others or unreasonably interferes

with the lawful use and enjoyment of their property, it will constitute a nuisance. *Id.* On the other hand, every annoyance or disturbance of a landowner from the use made of property by a neighbor does not constitute a nuisance. The question is not whether the plaintiffs have been annoyed or disturbed by the operation of the business in question, but whether there has been an injury to their legal rights, as people who live in organized communities must of necessity suffer some inconvenience and annoyance from their neighbors and must submit to annoyances consequent upon the *reasonable* use of property by others. *Id.* (Emphasis added.)

Resort must always be had to sound common sense and due regard should be given to the notions of comfort and convenience entertained by persons generally of *ordinary tastes and susceptibilities. DeBorde,* supra. A lawful business should not be enjoined on account of every trifling or imaginary annoyance, such as may offend the taste or disturb the nerves of a fastidious or overly sensitive person, but on the other hand, no one, whatever his circumstances or condition may be, should be compelled to leave his home or live in mental discomfort, although caused by a lawful and useful business carried on in his vicinity. *Id.* Whether a particular use of property is reasonable and whether such use constitutes a nuisance depends largely upon the facts of each case. *Winget,* supra. What is a reasonable use and whether a particular use is a nuisance cannot be determined by fixed general rules, but depends upon such facts as location, character of the neighborhood, nature of the use, extent and frequency of the injury, the effect upon the enjoyment of life, health, and property, and the like. *Id.*

Generally, a private nuisance is that class of wrongs that arises from the unreasonable, unwarrantable, or unlawful use by a person of his own property, personal or real. *Clark v. Greenville County,* 313 S.C. 205, 437 S.E. (2d) 117 (1993). Nuisance law is based on the premise that every citizen holds his property subject to the implied obligation that he will use it in such a way as not to prevent others from enjoying the use of their property. *Id.* The traditional concept of private nuisance requires the plaintiff to demonstrate that the defendants unreasonable interfered with their ownership or possession of the land. *Ravan v. Greenville County,* 315

S.C. 447, 434 S.E. (2d) 296 (Ct. App. 1993). A nuisance is a substantial and unreasonable interference with the plaintiff's use and enjoyment of his property. *Id.* It is anything which hurts, inconveniences, or damages; anything which essentially interferes with the enjoyment of life or property. *Strong v. Winn-Dixie Stores, Inc.*, 240 S.C. 244, 125 S.E. (2d) 628 (1962).

While a business may be a legitimate one and not a nuisance *per se*, it may become a nuisance *per accidens* by reason of its improper location or the manner in which it is conducted. *Bowlin v. George*, 239 S.C. 429, 123 S.E. (2d) 528 (1962). A nuisance *per accidens* is an act, occupation, or structure, not a nuisance *per se*, but one which may become a nuisance by reason of circumstances, location, or surroundings. *Strong*, supra. If one does an act in itself lawful, which yet, being done in that place, necessarily tends to damage another's property, it is a nuisance, for it is incumbent upon him to find some other place to do the act, where it will be less offensive. *Bowlin*, supra. For "[a] nuisance may be merely a right thing in the wrong place, like a pig in the parlor instead of the barnyard." *Id.*

Turning to the facts of this case, we find the preponderance of the evidence shows the Lever O'Cain family's use of the small strip of land in front of the Harold O'Cain family property to raise hogs constitutes a private nuisance and should be enjoined. Although the master found the odor and the flies were no worse once the hogs were moved in front of Jerry O. Cain's home, there is testimony from Jerry that the odor and the flies were indeed worse. Further, his wife, Tonya O'Cain, testified having the hogs in front of their house had caused them a lot of stress, the odor and the flies have gotten worse since the hogs have been there, the odor and the flies have affected the use of their decks, and she is embarrassed and ashamed to bring friends and family to her home. She testified the odor was pungent and the flies so bad that she did not even want to be in her home anymore. Based on our review of the record, we do not find this to be the reaction of an overly sensitive person. Further, both Jerry and Tonya testified the situation with the hogs was making it difficult, if not impossible, to sell their home. A person of ordinary tastes and susceptibilities would clearly find such a situation objectionable. Even though the general area of the property is

rural, and the business of raising hogs is a legitimate business and likely to occur in such an area, we find the location of the hogs on a small strip of land, between the plaintiff's property and the road and directly in front of the plaintiff's residence, is an unreasonable and unwarranted use of the defendant's property and constitutes a private nuisance. The defendants are preventing plaintiffs from enjoying the use of their property by the improper location of the hogs directly in front of the residence. The evidence is clear the defendants had other, more suitable land in the area on which to raise hogs, but chose an area which unreasonably interferes with the plaintiffs' enjoyment of their land. There is further evidence the defendants acted out of malice in placing the hogs there. The defendants have, indeed, placed "the pig in the parlor instead of the barnyard."

Balancing the benefits of an injunction to the plaintiffs against the inconvenience and damage to the defendants, we hold that justice and equity dictate the grant of an injunction. Accordingly, the order of the master is affirmed as to the equitable estoppel issue and reversed as to the denial of an injunction.

Affirmed in part and reversed in part.

CONNOR and HEARN, JJ., concur.